## APPEAL OF BOX BOARD & LINING CO.

Docket No. 5438.    Decided October 30, 1926.

1. The evidence is insufficient to show that taxpayer acquired good will of any determinable cash value, when it purchased the assets and business of another corporation in 1903.

2. Upon organization in 1903 taxpayer entered upon its books good will in the amount of $115,753.56, which amount it thereafter reduced from time to time in subsequent years, including the fiscal year ending April 30, 1919, by charges against surplus in the total amount of $48,091.59. *Held*, that the amount of $48,091.59 should be restored to surplus and included in invested capital for the fiscal year ending April 30, 1920.

*Herbert B. Hawkins, C. P. A.*, for the petitioner.
*Arthur H. Murray, Esq.*, for the Commissioner.

The Commissioner determined a deficiency of $3,876.88 for the fiscal year ending April 30, 1920. The taxpayer computed its invested capital for the taxable year by including therein alleged good will claimed to have been acquired in 1903 for stock at $67,622.27. It assigns the exclusion of this item from invested capital by the Commissioner as error.

FINDINGS OF FACT.

The taxpayer is a New York corporation organized April 9, 1903, to take over the assets, other than cash on hand and open accounts, of G. S. Cook & Co., a New Jersey corporation. In May, 1903, it purchased the assets of the business of D. J. O'Connell & Co., a Maine corporation.

G. S. Cook & Co. was organized about 1897, and until 1903 had been engaged in the box and straw-board business. The profits of the company from its first year's operations amounted to $6,000. There was a gradual increase thereafter until .1903, in which year the profits were $20,000.

In the early part of 1903, Joseph J. Kline, who owned all of the stock of Cook & Company, desired to retire. He approached Daniel

J. O'Connell, who was engaged in the same business, with the view of selling him the assets of Cook & Company. O'Connell was interested and proposed that Kline give him an option to purchase the assets and business of Cook & Company at the inventory value of the tangible assets at that time. This was done. O'Connell paid $5,000 in cash for this option. The cash and accounts receivable retained by the corporation amounted to approximately $40,000.

On May 2, 1903, O'Connell submitted to the taxpayer the following propositions:

I learn that your Company has been established with an authorized capital stock of One Hundred and fifty thousand Dollars ($150,000) divided into Five hundred (500) shares of preferred capital stock of the par value of One hundred Dollars ($100) each, and One thousand (1,000) shares of common stock of the par value of One hundred Dollars ($100) each, * * *; that your Company wishes to acquire properties sufficient for the prosecution of its lawful corporate purposes, and in connection therewith I submit the following proposition:

I have made arrangements whereby I am entitled to acquire and to transfer or cause to be transferred the merchandise, machinery, good will and entire properties of the G. S. Cook Company, a corporation organized under the laws of the State of New York, having its principal place of business in the Borough of Manhattan, City of New York, at 152 Wooster Street.

I offer to transfer or cause to be transferred said merchandise, machinery, good will and properties of the G. S. Cook Company, to the Box Board & Lining Company, upon payment by your Company to the G. S. Cook Company of the sum of Seven thousand Dollars ($7,000) in cash, and an additional sum in cash, equal to the inventory value of the merchandise of the G. S. Cook Company, such merchandise to be valued and inventoried at the market price to authorized dealers of such stock.

I also offer to pay or cause to be paid to your Company the sum of Sixteen thousand Dollars ($16,000) in cash, such amount to be credited on the amount of cash payable to the G. S. Cook Company as above stated, in the event that said properties and business of said Cook Company are transferred or are caused to be transferred by me.

I also offer to work for your Company for a period of one year, at a salary of Four thousand Dollars ($4,000) per annum and expenses and during the said period to use my best endeavors to put your Company upon a sound basis and in good working condition.

The consideration of the transfer of the properties and business aforesaid, of the payment of said Sixteen thousand Dollars ($16,000) in cash and of my agreement to enter your employ for the period of one year, upon the terms stated, is to be the issue to me of the full paid non-assessable stock of your Company as follows:

All of the preferred stock, to-wit, Five hundred (500) shares, and all of the common stock (less such shares as have heretofore been subscribed for by the Incorporators and Subscribers) to-wit, Nine hundred and ninety-five (995) shares, all of such shares of stock being of the par value of One hundred Dollars ($100) each, aggregating a total amount of One Hundred and forty-nine thousand five hundred Dollars ($149,500), all of said stock to be issued and delivered to me simultaneously with the perfection of arrangements for the transfer to your Company of the properties and business and the payment of the cash aforesaid.

This proposition was accepted by the taxpayer and it exercised the option to purchase the assets of Cook & Company and paid that company the inventory value of such assets, totaling $27,425.75, which included the $5,000 paid by O'Connell for the option. Joseph J. Kline subsequently caused Cook & Company to be dissolved and, having no further use for the books and records of the corporation, destroyed them in 1908 or 1909. The taxpayer's total authorized capital stock was $150,000 par value, consisting of $50,000 preferred and $100,000 common, and has since remained in that amount. All of this stock, with the exception of five qualifying shares of common stock, was issued to Daniel J. O'Connell for his option to purchase the assets of Cook & Company, for $16,000 in cash paid in by him, and for his agreement to manage the affairs of the taxpayer for one year at a salary of $4,000. Prior to 1903, O'Connell had been in the box and straw-board business for about twenty-seven years in various capacities with other concerns. At the time of taxpayer's organization and his election as its president, he was treasurer of D. J. O'Connell & Co., a Maine corporation, which had been engaged in the straw-board business for about two years.

About May, 1903, O'Connell turned back to the taxpayer certain of the preferred and common stock theretofore issued to him, and during the same year the corporation sold 355 shares of preferred stock at par, one share of common stock being given as a bonus with each of the 240 of the preferred shares sold.

At a meeting of the directors of the taxpayer on May 27, 1903, the following proceedings were had:

The president then referred to a proposition for the purchase of the properties and business of the D. J. O'Connell Company, a corporation of the State of Maine, engaged in a similar business to that of the Box Board & Lining Company, in the City of New York. He stated that he thought he could purchase the properties of the Company or acquire the same through the purchase of the stock of the Company, for the sum of $15,000—$6,000 in cash, $6,000 in time notes of this Company and $3,000 in preferred stock, the outstanding liabilities of the D. J. O'Connell Company to be assumed by the Box Board & Lining Company in the event of the purchase of its properties rather than the acquisition of its stock. He stated that he had surrendered to the Company 150 shares of its preferred stock, which had been duly issued to him and which was now available as treasury stock for the purpose aforesaid. He stated that he thought it was essential to the interests of the Company that the purchase should be made, but as to the means to be adopted he was not yet able to decide. Discussion thereupon ensued at length, and after due deliberation, on MOTION duly seconded and unanimously carried, the following resolutions were duly adopted:

*Resolved* that this Company purchase or otherwise acquire the properties, business and good will of the D. J. O'Connell Company, a corporation of the State of Maine, having a capital stock of $10,300 par value outstanding, for the consideration as follows: $6,000 in cash, $6,000 in time notes of this Company, and $3,000 in preferred stock; further

*Resolved* that the President and Secretary of this Company be and they hereby are authorized, empowered and directed to enter into negotiations with the D. J. O'Connell Company and with the stockholders thereof, to purchase the properties and good will of said Company or acquire the same by the purchase of the stock of said Company, the manner and method of acquisition, whether by purchase of properties or by the purchase of stock, the terms and conditions thereof and the entire management of and procedure in such purchase or acquisition to be absolutely in the discretion of such President and Secretary; the consideration for such purchase not to exceed the sum of $15,000 payable as and in the manner aforesaid; and in event of the purchase of the properties of such Company as distinguished from the purchase of the stock thereof, the additional consideration on the part of this Company to assume all outstanding liabilities of said D. J. O'Connell Company; further

*Resolved* that such President and Secretary be and they hereby are authorized, empowered and directed to do any and all things, and to make, execute and deliver any and all instruments by them deemed necessary or proper for the purchase of said properties or the purchase of said stock, including the power in event of the purchase of properties, to assume the outstanding liabilities of said D. J. O'Connell Company and to effectuate the intentions of these resolutions.

On the same date the stockholders authorized the purchase of the stock or the assets of the O'Connell Company at a price not to exceed $15,000. A few days subsequent the assets of the O'Connell Company were purchased for $15,000.

Upon the acquisition of the aforementioned properties, taxpayer entered upon its books good will at $115,753.56.

The taxpayer's operations have been profitable from the start, its earnings from the date of incorporation to September 7, 1903, amounting to $12,502.12. Since its organization it has, with the exception of a few years, paid annual dividends upon its preferred and common stock.

After the payment of dividends the remaining surplus or a portion thereof was credited to the good will originally entered upon the books in the amount of $115,753.56, with the result that from April, 1903, to the close of the fiscal year ending April 30, 1919, $48,091.59 had been so credited and the good will account thereby reduced to $67,662.27.

### OPINION.

LITTLETON: The taxpayer claims that when it acquired the assets and business of G. S. Cook & Co. through the exercise of an option to purchase theretofore given to D. J. O'Connell, and by reason of the contract with O'Connell to work for the company for one year at a salary of $4,000, it acquired for stock good will of an actual cash value of $67,622.27. The evidence submitted does not convince the Board that taxpayer acquired good will of any determinable cash value. It has been shown however that upon organization the

taxpayer entered upon its books good will in the amount of $115,-753.56, and that in the years following, including the fiscal year ending April 30, 1919, this amount was reduced from time to time by charges against surplus in the total amount of $48,091.59; $21,225.43 being so charged in the fiscal year ending April 30, 1918.

In view of the fact that the Commissioner has held that taxpayer acquired no good will having an actual cash value and has refused to include any amount in invested capital of this account, and we have approved this action on his part, it is apparent that surplus in the amount of $48,091.59 credited to alleged good will arbitrarily entered upon the books at $115,753.56 should be restored to the surplus account and included in invested capital for the taxable year. The Commissioner included in the invested capital for the taxable year surplus of $51,000. If this figure included the above sum of $48,091.59 credited to good will, the Commissioner's determination was correct; otherwise it was erroneous.

*Judgment will be entered on 15 days' notice, under Rule 50.*